IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **LYNNE OPLINGER,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| vs. | ) Civil No. 13-cv-642-CJP[1] |
| | ) |
| **CAROLYN W. COLVIN,** | ) |
| **Acting Commissioner of Social** | ) |
| **Security,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Lynne Oplinger seeks judicial review of the final agency decision denying her application for Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for benefits in July, 2010, alleging disability beginning on October 29, 2007. (Tr. 16). After holding an evidentiary hearing, ALJ James E. Craig denied the application in a written decision dated February 13, 2012. (Tr. 16-25). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

---

[1] This case was referred to the undersigned for final disposition on consent of the parties, pursuant to 28 U.S.C. §636(c). See, Doc. 26.

1. The ALJ erred in not sufficiently accounting for her cervical and lumbar spine impairments in his RFC assessment.

2. The ALJ failed to consider the effects of her obesity.

3. The analysis of plaintiff's credibility was faulty.

## **Applicable Legal Standards**

To qualify for SSI, a claimant must be disabled within the meaning of the applicable statutes.[2] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. §423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. 20 C.F.R. §§ 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals

---

[2] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

2

has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.  20 C.F.R. §404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009.

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three.  If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job.  *Rhoderick v.*

*Heckler*, 737 F.2d 714, 715 (7th Cir. 1984). *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether Ms. Oplinger was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)).

The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971). In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See,

*Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### The Decision of the ALJ

ALJ Craig followed the five-step analytical framework described above.  He determined that plaintiff had not worked at the level of substantial gainful activity since the application date.  He found that plaintiff had severe impairments of lumbar and cervical spine disorder.  He further determined that plaintiff's impairments do not meet or equal a listed impairment.

The ALJ found that Ms. Oplinger had the residual functional capacity (RFC) to perform work at the light exertional level, with some physical and mental limitations.  Plaintiff had no past relevant work. Based on the testimony of a vocational expert, the ALJ concluded that Ms. Oplinger was not disabled because she was able to do several jobs which exist in significant numbers in the local and national economies.

### The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.  The following summary of the record is directed to the points raised by plaintiff.

1.   **Agency Forms**

Plaintiff was born in 1960, and was almost 47 years old on the alleged onset date.  (Tr. 166).  She obtained a GED in 1989.  She stopped working on October 29, 2007, because of her condition.  (Tr. 160).  A prior claim had been denied as of June 19, 2007.  (Tr. 166).

In a Function Report submitted in September, 2010, plaintiff said she had

pain in her neck and back. She had muscle spasms in her back and legs. She had to elevate her legs when the spasms started. She used a cane and a walker because of her weakness and loss of balance. She had headaches which made it hard to concentrate. She had numbness and tingling down her right side. She lived with her brother, who did most of the household chores. She said that Dr. Parker prescribed a walker and cane in 2003. She used a cane when she was "up to do anything." (Tr. 170-177).

Plaintiff had worked in the past as a bartender, housecleaner, product demonstrator and telemarketer. (Tr. 182).

### 2.   Evidentiary Hearing

Ms. Oplinger was represented by an attorney at the evidentiary hearing on January 12, 2012. (Tr. 46).

Plaintiff did not have any medical insurance or a medical card. She was taking Lyrica and Norco for pain. She had trouble coming up with the money to pay for her medicines. (Tr. 47-48). She used a cane when she went out anywhere, and sometimes used a walker at home when she had spasms. (Tr. 48). She used a quad cane in the house. She could sit for about an hour, and then had to stand up or walk around. She could stand for about half an hour and walk for about 30 to 45 minutes. She spent a lot of her time sitting with her legs up to relieve the pressure on her spine. (Tr. 50-51). She testified that she used her cane every day and she lost her balance a lot. (Tr. 58).

A vocational expert (VE) also testified. The ALJ asked the VE a hypothetical question which comported with the ultimate RFC assessment, that is, a person of

6

plaintiff's age and work history who was able to do work at the light exertional level, limited to no continuous pushing or pulling with the upper or lower extremities, only occasional stooping, kneeling and crouching, no crawling, no exposure to extreme temperatures, wetness or humidity, no exposure to moving mechanical parts, electrical shock or heights, and no detailed or complex work. The VE testified that this person could do jobs that exist in significant numbers in the national economy. Examples of such jobs mail room clerk, sorter, and marker or labeler. (Tr. 59-60). The VE also testified that, if the person needed to use a cane occasionally during the day, she could not do any of those jobs. (Tr. 61).

### 3. Medical Treatment Prior to Alleged Onset Date

Plaintiff had on-the-job injury in March, 2003, in which she was hit in the back of the head by the rearview mirror on a pickup truck. (Tr. 268). In October, 2003, she underwent a discectomy and fusion at C6-7. An epidural hematoma developed, which was evacuated the same day. (Tr. 280-287).

In November, 2006, Dr. Kee Park, a neurosurgeon, noted that she had undergone both cervical and lumbar fusions. A recent CT scan showed excellent fusion at L5-S1, and no hardware failure at C6-7. The MRI showed "excellent decompression at these levels and no evidence of recurrent problems as far as adjacent level disease. Dr. Park also noted that she had "residual neck and back pain which is not uncommon." (Tr. 386).

### 4. Medical Treatment After Alleged Onset Date

Plaintiff began seeing Dr. Nekzad at Carterville Family Practice as her primary care physician in March, 2008. She weighed 191 pounds. He noted her

history of spinal surgery. He diagnosed chronic pain, but did not specify where her pain was located. He also noted that she should get her medications through "P-CAP."[3] (Tr. 453-454).

In February, 2009, plaintiff complained to Dr. Nekzad of headaches and numbness and tingling in her right arm and leg. He ordered an MRI of the brain, which was normal. (Tr. 442, 545). In March, 2009, Dr. Nekzad recommended that she see a neurologist for evaluation of the continued numbness in her leg. An appointment was made, but she had to reschedule because she had to come up with the $100.00 fee. (Tr. 439-400). The neurologist did a nerve conduction study on May 1, 2009. This test showed no evidence of right-sided lumbar radiculopathy or polyneuropathy. (Tr. 531-532). In July, 2009, Dr. Nekzad found palpable tenderness in the right paraspinal muscles in the lumbar area. (Tr. 500). In 2008 and 2009, Dr. Nekzad prescribed medications including Vicodin, Darvocet, Flexeril, Tramadol and Celebrex. (Tr. 489-490).

In July and August, 2010, plaintiff complained to Dr. Nekzad of increased neck pain, which caused headaches, and increased back pain. She had pain going into her legs "to the point where she cannot take the pain anymore." Ultram was not helping. Dr. Nekzad prescribed Vicodin and ordered an MRI of the lumbar spine. (Tr. 494, 648). The MRI showed moderate L4-5 spinal canal stenosis, mild bilateral L3-4 foraminal stenosis, moderate bilateral L4-5 foraminal stenosis, and a small left L4-5 disc herniation contacting the exiting left L-4 nerve root. (Tr.

---

[3] PCAP refers to a program in which a pharmaceutical company assists low-income patients in obtaining prescription medications at reduced cost. See, for example, http://www.medicare.gov/pharmaceutical-assistance-program/, accessed on January 21, 2015.

668-669).

In September, 2010, Ms. Oplinger was continuing to complain of back pain radiating into both legs. Dr. Nekzad wanted her to see a neurosurgeon, but he acknowledged that "with her insurance that is a very difficult task." He noted that she was "uncomfortable in the chair." He refilled her Vicodin. (Tr. 645).

Ms. Oplinger went to the emergency room for back pain after falling on wet leaves in October, 2010. X-rays showed no acute abnormalities of the cervical or lumbar spine. (Tr. 580-583).

Plaintiff began seeing doctors at Trinity Neuroscience Institute for low back pain radiating into her right leg in December, 2010. The doctor noted that she had no insurance and he was therefore "trying to alleviate cost." He offered her a referral to pain management. (Tr. 822) Plaintiff called the office on January 6, 2011, and said she "can't afford it at this time." She was waiting on a medical card and disability. (Tr. 823). On January 14, 2011, Trinity Neuroscience referred her to Dr. Criste for an epidural steroid injection. (Tr. 820).

Dr. Criste performed an epidural steroid injection in February, 2011. (Tr. 742). On February 15, 2011, Dr. Criste noted that she was using a four point cane for right-sided weakness. (Tr. 745). Plaintiff called Dr. Criste's office on March 3, 2011, and said she was in extreme pain. Dr. Criste prescribed Nucynta, but she asked for something cheaper because she had to pay out-of-pocket. (Tr. 739). She returned to Trinity Neuroscience in March, 2011. She was using a cane to ambulate. The doctor observed that her gait was antalgic on the right. She was 5' 1" tall and weighed 200 pounds. Straight leg raising was positive on the right.

9

She was referred back to Dr. Criste for a selective nerve root block. (Tr. 810-812).

Dr. Criste saw her on April 15, 2011, and agreed that she was a candidate for an L5 selective nerve root block. He refilled her prescription for Percocet, but noted that she needed to be on an "opioid contract" because she was "abusive to nurses and had some drug seeking tendencies." (Tr. 736-737). The nerve block was done on May 17, 2011. (Tr. 731).

On May 23, 2011, plaintiff was seen at Trinity Neuroscience. She had no relief from the nerve block and was still having low back pain. Dr. Taveau reported that she was neurologically intact, but straight leg raising was positive on the right. He also noted that she complained of additional symptoms extending to "multiple other dermatomal distributions on the right lower extremity." She was in a wheelchair. He did not think that additional lumbar surgery would resolve her back pain. He referred her back to Dr. Criste for consideration of a pain pump. (Tr. 805-807).

Dr. Criste saw plaintiff on June 10, 2011. On exam, she had normal range of motion, normal muscle strength and normal stability in all extremities with no pain on inspection. He recommended against a pump because of her young age and nonmalignant pain. He increased the dosage of Norco, but noted that they would monitor her closely as she had "some drug seeking tendencies." (Tr. 724-726).

Ms. Oplinger continued to be treated at Trinity Neuroscience. On June 30, 2011, a doctor there noted that she had normal range of motion, muscle strength and stability in all extremities, but she also had a right limping gait. She was

complaining of aching pain in the right shoulder radiating into the arm. He ordered a cervical MRI and nerve conduction study. (Tr. 798-802).

A nerve conduction study performed in July, 2011, showed bilateral median nerve entrapment, bilateral C5-6 radiculopathy, prolonged F wave of the L median nerve, and bilateral mild radial, left ulnar and right median sensory neuropathy. The doctor concluded that the findings were consistent with neuralgia, neuritis and radiculitis, unspecified. The severity level was mild. (Tr. 789, 791). An MRI of the cervical spine showed mild C3-4 and C4-5 central canal stenosis, multilevel foraminal stenosis and multilevel hypertrophic facet arthropathy, most marked at C7-T1. (Tr. 781-782). In August, 2011, an EEG was normal. (Tr. 783).

The last visit at Trinity Neuroscience was on September 29, 2011. Plaintiff complained of headache. On exam, she had normal range of motion, muscle strength and stability in all extremities, and her balance and gait were intact. The doctor wrote "Neurologically normal, usees [sic] cane for ? pain." (Tr. 851-854).

### 5.     Opinion of Consultative Examiner

Dr. Adrian Feinerman examined plaintiff on September 27, 2010. She complained of back pain, bilateral leg pain, balance problems while walking, headaches, right arm falling asleep, headaches and excessive menstrual bleeding. Dr. Feinerman wrote that plaintiff "[w]ould not get on examination table due to pain." Further, the "examination was done in a wheelchair due to back pain." She also had a cane to help with balance. Dr. Feinerman found restricted range of motion of the cervical and lumbar spine in all directions. Flexion (forward bending) of the lumbar spine was 30 degrees. Normal flexion is 90 degrees. Right

11

lateral and left lateral flexion of the cervical spine were both limited to 15 degrees. 45 degrees is normal. Left and right rotation of the cervical spine were both limited to 30 degrees. 80 degrees is normal. She had no muscle spasm or atrophy. Muscle strength was normal throughout. She was able to ambulate 50 feet without an assistive device. She had severe difficulty with squatting and arising, and moderate difficulty with hopping on one leg. Sensory exam was normal. Straight leg raising was negative. Dr. Feinerman concluded that she was able to sit and stand normally and that she could lift, carry and handle objects without difficulty. (Tr. 558-567).

      6.    **RFC Assessment**

In October, 2010, state agency consultant B. Rock Oh, M.D., evaluated plaintiff's physical RFC based upon a review of the records. He concluded that she could do light work (occasionally lifting 20 pounds, frequently lifting 10 pounds, standing/walking for 6 out of 8 hours, sitting for 6 out of 8 hours), with limitations in using her lower extremities for pushing/pulling. She was also limited to only occasional postural activities. Occasional is defined as up to one-third of an 8 hour workday. (Tr. 568-575).

## Analysis

The Court agrees with plaintiff that ALJ Craig made several errors in denying her application for benefits.

First, the ALJ did not adequately discuss plaintiff's alleged need to use a cane. He acknowledged that she testified that she used a cane, and that, on at least one visit, Dr. Trivedi at Trinity Neuroscience observed that she was using a cane.

12

In addition, he noted that Dr. Feinerman said that she was able to walk 50 feet without her cane. However, the ALJ never specified whether he believed she needed a cane to walk, and, if not, why not.

The failure to address plaintiff's need for a cane is dispositive here. The VE testified that, if plaintiff had to use a cane to walk for up to one-third of the day, she would not be able to do any of the light exertional jobs he identified, or any other jobs. (Tr. 81). Under that evidence, if Ms. Oplinger needs to use a cane, her application should have been granted.[4]

This case is remarkably similar to *Thomas v. Colvin*, 534 Fed.Appx. 546 (7th Cir. 2013). The VE in that case gave testimony similar to the VE's testimony in our case. The ALJ in *Thomas* acknowledged that there was some evidence that the plaintiff used a cane, but did not explain why he did not include the need for a cane in his RFC assessment. The Seventh Circuit held that the failure to address plaintiff's alleged need for a cane required remand. "Although the ALJ need not discuss every piece of evidence in the record, he must confront the evidence that does not support his conclusion and explain why it was rejected." *Thomas*, 534 Fed. Appx. at 550, internal citations omitted.

The Commissioner argues generally that the ALJ's RFC assessment was supported by substantial evidence, but she does not directly answer plaintiff's point about the failure to address her need for a cane. She points out that Dr. Feinerman observed that plaintiff could walk for 50 feet without a cane, and the

---

[4] At her age, if plaintiff is limited to sedentary work, she would be considered disabled under the Grids. 20 C.F.R. Part 404, Subpart P, Appendix 2, §200.00(g); Rules 201.12-201.16.

13

ALJ gave significant weight to his opinion. However, the ability to walk for 50 feet without a cane does not equal the ability to stand or walk without a cane for 6 hours out of an 8 hour workday. See, *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011)(Observing that the ability to walk 50 feet without a cane in a doctor's office "hardly demonstrates an ability to stand for 6 hours….")

The Commissioner also argues that the ALJ properly found Ms. Oplinger's allegations to be not fully credible. This Court disagrees, as will be explained below. Even if the ALJ's credibility determination were adequate, "generally discrediting [plaintiff's] testimony without addressing her reliance on a cane" does not satisfy the ALJ's obligation to explain the basis for his RFC assessment or to build the requisite "logical bridge" from the evidence to his conclusions. *Thomas*, 534 Fed. Appx. at 550.

Contrary to the Commissioner's argument, the ALJ's credibility analysis is not adequate. He erred in using the boilerplate language that has often been criticized by the Seventh Circuit, and failing to give reasons grounded in the evidence for his adverse credibility determination. *Minnick v. Colvin*, ___ F.3d ___, 2015 WL 75273, *6-7 (7th Cir. 2015). The ALJ relied, in part, on his perception that Ms. Oplinger had minimal treatment from 2007 to 2010, "suggesting that her level of pain was under control during this time." (Tr. 21). However, plaintiff testified that she had no insurance at the time of the hearing, and the medical records reflect that she had difficulty obtaining medical treatment because of her inability to pay. It was error for the ALJ to draw an adverse conclusion about her credibility without addressing this evidence. *Garcia v.*

14

*Colvin*, 741 F.3d 758, 761-762 (7th Cir. 2013). The ALJ also highlighted Dr. Criste's remark that plaintiff had "drug seeking tendencies." (Tr. 22). The Commissioner argues that this is evidence supporting the credibility determination. The ALJ did not explain why he found this remark to be significant. However, Dr. Criste evidently did not believe that plaintiff was faking her pain, as he *increased* the dosage of Norco at the visit cited by the ALJ. (Tr. 724-726). Logically, therefore, it is difficult to see how this evidence supports the adverse credibility determination.

The ALJ is "required to build a logical bridge from the evidence to his conclusions." *Simila v. Astrue*, 573 F.3d 503, 516 (7th Cir. 2009). ALJ Craig simply failed to do so here. He did not adequately explain why he apparently concluded that plaintiff could stand or walk for six hours a day without a cane, and his analysis of her credibility was inadequate. "If a decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012), citing *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Ms. Oplinger is disabled or that she should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying Lynne Oplinger's application for

15

social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

DATE:      January 23, 2015.


                              <u>s/ Clifford J. Proud</u>
                              **CLIFFORD J. PROUD**
                              **UNITED STATES MAGISTRATE JUDGE**